IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03469-WJM-SKC

LESLIE SHANNON,
     Plaintiff,

v.

CHERRY CREEK SCHOOL DISTRICT,
DARLA THOMPSON, Former Principal Highline Elementary,
SCOTT SIEGFRIED, Superintendent,
KEVIN WATANABE, Former Assistant Principal Highline Elementary,
CHERRY CREEK SCHOOL DISTRICT BOARD OF EDUCATION, and
TY VALENTINE, Director of Human Resources,
     Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants Cherry Creek School District (the "District"), Darla Thompson, Scott Siegfried, Kevin Watanabe, Cherry Creek School District Board of Education (the "Board"), and Ty Valentine, by and through their undersigned attorneys, move pursuant to Fed. R. Civ. P. 56 for summary judgment on all three of Plaintiff Leslie Shannon's claims, as set forth below.

## INTRODUCTION

This is an employment case in which Shannon claims the District nonrenewed her probationary teaching contract because of her race or in retaliation for expressing dissatisfaction with District-required equity training and her principal. She also complains a subsequent employment reference by her principal was retaliatory and gives rise to tort liability. As detailed below, Shannon has no evidence of discrimination or retaliation. She relies on the fact of her nonrenewal, the principal's reference, which she admits was truthful, and her own unsupported subjective belief. Defendants, in contrast, have extensive evidence that Shannon long had notice of performance and conduct concerns, and despite extended opportunities over three school years, she did not demonstrate professional growth. She was nonrenewed

1

because the principal had no confidence Shannon would improve, and she believed a better teacher could be recruited from the pool. Summary judgment for Defendants is the proper result.

## MOVANT'S STATEMENT OF MATERIAL FACTS

1.      Highline Elementary School is a school in the District that serves a highly diverse student population, with a significant majority of its students eligible for Free and Reduced lunch. Ex. A, D. Thompson Decl., ¶ 2.

2.      Darla Thompson served as Highline's principal over five school years from 2014–15 to 2018–19. *Id.* Thompson is Hispanic. *Id.*

3.      Thompson hired Shannon as a Science, Technology, Engineering, and Mathematics ("STEM") teacher at Highline beginning in the 2016–17 school year. *Id.* at ¶ 4. Thompson knew at the time that Shannon is Black. *Id.*

4.      Most of Shannon's prior teaching experience was in other states, and she had not obtained nonprobationary status at a Colorado school prior to her hire. *Id.* at ¶ 5. Consequently, Thompson hired Shannon as a probationary teacher, which Thompson understood meant that Shannon's employment contract would be subject to nonrenewal on an annual basis. *Id*. at ¶¶ 5, 15.[1]

5.      The District values equity and inclusion in both instruction and the work environment. *Id.* at 6; Ex. B, B. Smith Decl., ¶ 3. It has nondiscrimination policies that prohibit discrimination and retaliation in employment. *Id.* at ¶ 13.

6.      The District also has a longstanding relationship of at least 19 years with Pacific Educational Group ("PEG"), a business that provides equity training, including a program called Beyond

---

[1] As a matter of law, public school teachers in Colorado have either probationary or nonprobationary status. § 22-63-103(7), C.R.S. A school district may nonrenew the contract of a probationary teacher for any reason it deems sufficient. § 22-63-203(2)(a), (4)(a), C.R.S. A teacher earns nonprobationary status with three consecutive years of effective performance. § 22-63-103(7).

Diversity. *Id.* at ¶ 3; Ex. C, M. Giles Depo., 31:10–22.

7.     The topic of White Privilege is discussed in the training, and the purpose is to "understand how whiteness or white privilege plays in [the District]," "create greater consciousness," and build "knowledge and capacity around racism." *Id.* at 34:19–35:3. The District uses PEG as a source to "give[] language and common understanding so that people can engage in those courageous conversations interracially and intra-racially." *Id.* at 6:23–7:1.

8.     Thompson felt very strongly about equity and inclusion, and she emphasized those values at Highline. Ex. A, Thompson Decl., ¶ 6. One day each week teachers at Highline attended Professional Learning Community ("PLC") meetings after students left for the day, and once a month, the PLC meetings were devoted to equity topics. *Id.* Thompson required all teachers to attend the PLC meetings, though she was flexible when scheduling conflicts arose. *Id.* at ¶ 7.

9.     Several staff members were designated as the "equity facilitators," and in that role, they planned and led each month's equity-focused PLC meeting. *Id.* at ¶ 6. While Thompson expected staff to engage in the equity work, the equity facilitators did not require active participation in those meetings. *Id.*

10.     Topics at the equity-focused PLC meetings included white privilege and how implicit bias can negatively impact students of color. Ex. D, K. Watanabe Decl., ¶ 8.

11.     Thompson was Shannon's supervisor, and she was Shannon's evaluator during the 2016–17 school year. Ex. A, Thompson Decl., ¶ 8. It was Thompson's practice to base evaluations, in part, on informal and formal classroom observations followed by meetings at which the evaluator provides feedback to the teacher about their classroom performance. *Id.*

12.     During the 2016–17 school year, Thompson observed Shannon multiple times, informally and formally. *Id.* During classroom observations, Thompson observed that Shannon did not use STEM-focused classroom materials to maximize instruction time. *Id.* at ¶ 9. She also observed that Shannon did

not consistently differentiate her instruction amongst grade levels, such that students in first grade were often doing the same activities as those in higher grades. *Id.* Shannon also did not differentiate instruction based on individual student needs. *Id.*

13.     Thompson further observed Shannon using a harsh tone with students, which was disrespectful. *Id.* She directed Shannon to be thoughtful of her tone with redirecting and correcting students in order to treat them all respectfully and fairly. *Id.*

14.     Shannon received "basic" and "partially proficient" ratings on most of the individual performance standards in the evaluation. *Id.* at 10. Her overall rating, however, passed the "effective" threshold because of the positive impact of Highline and the District's overall state performance framework ratings, which are largely based on student standardized test scores. *Id.*

15.     Although she could have nonrenewed Shannon, Thompson wanted to give Shannon the benefit of the doubt and an opportunity to grow as a teacher. *Id.*

16.     Shannon had a different evaluator the next year, 2017–18, who noted the same concerns around differentiation and scaffolding for students. *Id.* at ¶ 11.

17.     Although there were still concerns with Shannon's performance, Thompson retained Shannon for a third year in hopes that she would show growth and because Thompson valued Shannon's diversity for Highline's student population. *Id.*

18.     During the 2018–19 school year, Shannon's evaluator was Highline's new Assistant Principal Kevin Watanabe. *Id.* at ¶ 14. Watanabe is Asian. Ex. D, Watanabe Decl., ¶ 8.

19.     Watanabe observed Shannon multiple times, informally and formally. *Id.* at ¶ 4. During the classroom observations, Watanabe felt Shannon was doing the very bare minimum amount of work to be a classroom teacher. *Id.* at ¶ 5. Shannon was not prepared for lessons and did not seem to have the requisite knowledge of the STEM content area. *Id.* She did not demonstrate rigor in the classroom, and

her lessons lacked consistency. *Id.*

20.     Shannon often showed videos in class that did not seem to have any connection to STEM, such as the Disney movie *Moana* and the animated television series, *The Magic School Bus*. *Id.* As a result, Watanabe directed Shannon to provide lesson plans for her classes so he could review them and provide feedback, but she failed to do so. *Id.*

21.     Watanabe also observed that Shannon lacked follow-through. *Id.* at ¶ 7. On one occasion, Shannon committed to teach a science unit for the first grade teachers, but she failed to prepare the lessons and the teachers had to teach the unit themselves. *Id.* On another occasion, Shannon committed to assist teachers in facilitating a school-wide "grab bag" project where students were to build something with the contents of the bag they received. *Id.* Shannon called in sick the day she was supposed to provide instruction to teachers about the grab bag project, and Watanabe had to provide the instruction to them. *Id.* Shannon also called in sick the following week on the day of the grab bag challenge itself, so she was not there to facilitate it or assist teachers or students with the project. *Id.*

22.     During the 2018–19 school year, Shannon was absent for a total of 26 school days. Ex. A, Thompson Decl., ¶ 12. Teachers who take leave are required to leave lesson plans so that a substitute teacher can provide instruction in the teacher's absence. Ex. D, Watanabe Decl., ¶ 6.

23.     When Shannon was absent, she failed to timely request a substitute teacher, leaving her colleagues to cover her classes. Ex. A, Thompson Decl., ¶ 12. This created a significant burden on other teachers and school administration. *Id.* Further, Shannon often failed to leave lesson plans when she was absent, and when she did leave them, they typically were minimal. *Id.*

24.     For example, Shannon took bereavement leave following the death of her aunt. Ex. D, Watanabe Decl., ¶ 6. The leave extended over two weeks in February 2019. Ex. E, L. Shannon Depo., 218:1–25. Shannon failed to leave lesson plans; rather, she left a stack of books with a note on top. Ex. D,

Watanabe Decl., ¶ 6. Watanabe felt this was wholly inadequate, contrary to the District's leave procedures, and inconvenienced her colleagues because they did not know what they were supposed to teach in Shannon's absence. *Id.*

25.     One of Shannon's STEM projects was a school-wide balloon launch. Ex. A, Thompson Decl., ¶ 13. Shannon was supposed to practice the launch in advance. *Id.*

26.     Right before a regularly scheduled PLC meeting, Shannon came to Thompson in the school's main office and said she could not attend the meeting because she needed to practice the balloon launch. *Id.* Thompson expressed that Shannon should have scheduled the practice around the mandatory meeting. *Id.* Thompson perceived that Shannon then raised her voice and became very argumentative. *Id.* Thompson was concerned about Shannon's unprofessionalism and called out the behavior; nonetheless, she granted the last-minute request and excused Shannon from the PLC meeting. *Id.*

27.     Watanabe met with Shannon in December 2018 to discuss her performance during the first half of the year, and her midyear observation. *Id.* at ¶ 9. During that meeting, he discussed his concerns about Shannon's lack of rigor, professionalism, and conduct. *Id.*

28.     Additionally, during the meeting, Shannon expressed concern to Watanabe about the equity-focused PLC meetings. *Id.* Watanabe heard that Shannon did not like the format of the meetings, which consisted of conversations amongst the large group of staff members, and that she would feel more comfortable sharing her perspective in small groups. *Id.* Shannon also told Watanabe about the balloon launch interaction with Thompson in which she felt Thompson accused her of being "angry" and "argumentative"; Shannon felt those were negative stereotypes about Black women. *Id.*

29.     Shannon asked that Watanabe maintain her confidentiality about both concerns, and he did so. *Id.* He did not tell Thompson or anyone else what Shannon told him. *Id.*

30.     Shannon never complained to Thompson about the equity work or equity PLC meetings at

Highline. Ex. A, Thompson Decl., ¶ 17. Moreover, no one ever told Thompson that Shannon had complained to them about the equity work or equity PLC meetings at Highline. *Id.*

31.     In February 2019, students performed a musical for Black History Month that included historically African American spiritual songs. Ex. A, Thompson Decl., ¶ 18. The musical was discussed during a staff meeting. *Id.*

32.     Watanabe does not recall ever discussing the musical with Shannon or otherwise hearing that she had concerns about it. Ex. D, Watanabe Decl., ¶ 10. He certainly did not tell Thompson or anyone else that Shannon had expressed concern about the musical. *Id.*

33.     Thompson never discussed the musical with Shannon. Ex. A, Thompson Decl., ¶ 18. She also never heard that Shannon had any concerns about the musical until this lawsuit was filed. *Id.*

34.     Shannon's 2018–19 final performance evaluation rating was "partially effective." Ex. D, Watanabe Decl., ¶ 11. Watanabe deemed that Shannon's performance did not meet the District's expectations and was not satisfactory. *Id.*

35.     Shannon did not provide the information required to complete her evaluation. *Id.* She was supposed to provide final student learning objectives ("SLOs"). *Id.*; Ex. E, Shannon Depo., 139:15–18, 140:1–141:7. She failed to do so, and Watanabe emailed her several times to ask her to provide the SLOs. Ex. D, Watanabe Decl., ¶ 11. Shannon never did so. *Id.*

36.     Watanabe shared concerns about Shannon's teaching performance with Thompson that were similar to those Thompson had observed, including that he was concerned about the lack of rigor in her classroom and the lack of differentiation in her lessons. Ex. A, Thompson Decl., ¶ 14. Watanabe shared concerns about Shannon's failure to obtain substitute teachers and leave lesson plans when she was absent. *Id.* He also told Thompson that Shannon failed to provide final SLOs. *Id.*

37.     Watanabe's concerns demonstrated to Thompson that Shannon had not evidenced much

professional growth at Highline. *Id.* at ¶ 14. Thompson expected more from a veteran teacher over three school years. *Id.* at ¶ 15. She believed that Highline's students would benefit from more effective STEM instruction than Shannon was able to provide. *Id.* She also determined Shannon was unlikely to improve as a teacher and was confident she could recruit a better teacher from the applicant pool. *Id.* at ¶ 16.

38.    Accordingly, Thompson determined that Shannon's employment should not continue, and she decided to recommend Shannon for nonrenewal. *Id.* at ¶ 15. Thompson's decision was not based on Shannon's race, nor was it retaliatory in any way. *Id.* at ¶¶ 16–17.

39.    Watanabe was not involved in the nonrenewal decision. Ex. D, Watanabe Decl., ¶ 12.

40.    In the District, Negotiated Policy 4173 broadly outlines the process for nonrenewing probationary teachers. Ex. B, Smith Decl., ¶ 4. As emphasized in Policy 4173, one of the purposes of probationary status is to afford the District maximum flexibility in hiring personnel. *Id.*; Ex. L, 2018-2019 Teachers Negotiated Agreement, p. 35

41.    Building-level administrators, including school principals, are tasked with deciding whether probationary teachers should return for a subsequent school year or whether they should be recommended for nonrenewal. Ex. B, Smith Decl., ¶ 5. Because principals work closely with the teachers they oversee, they are deemed to be in the best position to determine if a teacher should be recommended for nonrenewal. *Id.*

42.    Nonrenewal recommendations are made to the District's Human Resources Department for presentation to the District's Board. *Id.* at 7. Human Resources staff do not review the propriety of the principal's recommendation as a matter of course but rely on the business judgment of the principal. *Id.*

43.    Human Resources provides written guidance to principals every year about the nonrenewal process. *Id.* at ¶ 6. That guidance for the 2018–19 school year listed five reasons for nonrenewal: 1) program change or reduction; 2) enrollment decline; 3) program flexibility; 4) ineffective performance;

and 5) other. *Id.* Principals were informed that nonrenewal for ineffective performance had several important legal requirements, such as issuance of a remediation plan and allowance of a reasonable period of time for the teacher to improve. *Id.*[2] Principals also were informed that nonrenewal for the fifth reason, "other," did not have the same requirements and could apply to allow complete and sole discretion for the hiring of the best teachers possible. *Id.*

44.    The decision to nonrenew a teacher in order to go to the applicant pool often involves performance concerns, but Human Resources has generally advised principals that nonrenewals should not be coded for ineffective performance unless there are grave concerns with a teacher's effectiveness and all legal requirements have been met. *Id.*

45.    It is not uncommon for administrators to have performance and conduct concerns about teachers who also receive overall ratings of "effective" on their yearly evaluations. *Id.* at 10. The District is high-performing, and overall teacher performance ratings generally benefit from the student performance weighting. *Id.*[3]

46.    It is also not uncommon for teachers in their third year of teaching to be nonrenewed. *Id.* Given the extensive due process to dismiss a nonprobationary teacher for cause,[4] Human Resources generally advises that a principal recommend a third-year probationary teacher for nonrenewal if there are any performance concerns. *Id.*

47.    Thompson understood Human Resource's guidance to be that a nonrenewal should not be coded as ineffective performance unless a teacher was extremely ineffective. Ex. A, Thompson Decl., ¶ 16. Accordingly, she coded Shannon's nonrenewal as "other." *Id.*

---

[2] *See generally* § 22-9-106(3.5)(b)(I), (4.5)(b), C.R.S.

[3] State law requires that half of a teacher's performance evaluation rating is based on student academic growth. § 22-9-106(1)(e)(II), C.R.S.; 1 CCR 301-87, § 3.03.

[4] *See generally* §§ 22-63-301 to -302, C.R.S.

48.     Thompson met with Shannon in April 2019 and stated that she intended to recommend Shannon for nonrenewal. *Id.* at ¶ 19. During the meeting, Thompson told Shannon the reason for the nonrenewal was "other" under Policy 4173. Ex. F, D. Thompson Depo., 55:11–13. Thompson also told Shannon the nonrenewal was not due to performance. *Id.* at 55:14–16. Thompson said that because the coded reason for the nonrenewal was "other" under Policy 4173—not the separate reason code for ineffective performance. Ex. A, Thompson Decl., ¶ 16.

49.     Thompson also told Shannon that she would not write a letter of recommendation but would provide a reference. Ex. E, Shannon Depo., 163:10–15; Ex. F, Thompson Depo., 58:2–10.

50.     After Thompson notified Shannon of the nonrenewal recommendation, Shannon filed an internal grievance. *Id.* at ¶ 20. Human Resources staff interpreted the grievance to argue that Policy 4173 was unfair and express concern about cultural differences without any reference to a specific policy violation. Ex. G, T. Valentine Depo., 9:9–20, 15:8–22. Human Resources staff determined that the grievance did not speak to discrimination or discrimination policy. *Id.* at 9:14–15.

51.     The grievance was forwarded to Thompson because she was Shannon's supervisor, and Thompson drafted a response. *Id.* at 10:22–11:15. Human Resources staff reviewed Thompson's response and felt it correctly determined the grievance had no merit because the nonrenewal policy was followed; staff also felt Thompson was impartial and objective. *Id.* at 11:16–25, 15:7–18.

52.     Shannon filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 10, 2019. Ex. A, Thompson Decl., ¶ 20. The District forwarded the EEOC charge to its legal counsel. Ex. G, Valentine Depo., 12:10–19, 16:13–17.

53.     In the Spring of 2019, Thompson received a reference call about Shannon from a school leader in Aurora Public Schools ("APS"). Ex. A, Thompson Decl., ¶ 21. It is Thompson's regular practice to provide references when she receives such requests about current and former employees. *Id.* Thompson

accurately told the school leader that Shannon was absent for 26 days during the 2018–19 school year; she also accurately shared that Shannon did not submit her required SLO goals for that year. *Id.* Thompson made some positive comments about Shannon as well. *Id.* Thompson's reference was not based on Shannon's race nor was it in retaliation for her EEOC Charge or grievance. *Id.* No one else contacted Thompson for a reference about Shannon. *Id.*

54.     Human Resources Director Valentine was not involved in the APS reference call. Ex. G, Valentine Depo., 22:5–11.

55.     Shannon subsequently filed a second grievance against Thompson. Ex. A, Thompson Decl., ¶ 20. Human Resources staff determined that Shannon's second grievance was not cognizable because per the District's Master Agreement with teachers, the grievance process applied to employees, and by that time, Shannon was no longer employed by the District. Ex. G, Valentine Depo., 17:8–15.

56.     The Chief Human Resources Officer presented Shannon's and more than 60 other teachers' nonrenewal recommendations to the District's Board as a group. Ex. B, Smith Decl., ¶¶ 8, 12. The Board was provided a list that indicates the teacher's names, where they work, what they teach, their probationary year (one, two, or three), their principal, and the reason for nonrenewal. *Id.* at ¶ 8.

57.     Siegfried, who was the District's Superintendent at the time, was only the formal and legal administrative conduit of Thompson's recommendation to the Board. Ex. H, S. Siegfried Decl., ¶¶ 1, 3–4.[5] Every time he made nonrenewal recommendations, Siegfried did so in full reliance on his subordinates. *Id.* He had no personal or first-hand knowledge of the facts or circumstances of either Shannon's employment with the District or her contract nonrenewal. *Id.* at ¶ 5.

58.     The Board was not informed of Shannon's or any of the other teachers' race or other demographic information. Ex. B, Smith Decl., ¶¶ 8, 12. According to Board officer Kelly Bates, the Board

---

[5] Per § 22-63-203(4)(a), C.R.S., the nonrenewal recommendation must be made to a school board by a district's chief executive officer.

also was not aware that Shannon had filed grievances. Ex. I, K. Bates Decl., ¶¶ 1, 4; Ex. J, K. Bates Depo., 9:1–4.

59.     The Board approved all the recommended nonrenewals, including Shannon's, with a public vote in one combined personnel action. Ex. B, Smith Decl., ¶¶ 9, 12 & Attach. B-3. There was no discussion. Ex. J, Bates Depo., 9:16–22. Shannon's employment ended effective June 30, 2019. Ex. A, Thompson Decl., ¶ 22.

60.     During Shannon's three years as a District employee, she never received any written disciplinary action, such as a letter of reprimand. *Id.* at ¶ 23.

**SHANNON'S THREE CLAIMS**

Shannon broadly asserts three claims for relief. First, she claims she was discriminated against and subjected to a hostile work environment because of her race while at Highline. ECF #36, pp. 10–18. Second, she claims she was retaliated against, wrongfully terminated, and defamed for speaking out about White Privilege training and Thompson. *Id.* at 18–25. Third, she claims she was retaliated against, defamed, and subjected to tortious interference and a tangible employment act in connection with Thompson's employment reference. *Id.* at 25–29. Shannon generally invokes Title VII,[6] Section 1981, Section 1983,[7] and the Colorado Antidiscrimination Act ("CADA"). *Id.* at 1–2. The first claim is against every defendant except Valentine, the second is against all of them, and the third is against all except Watanabe. *Id.* at 10, 18, 25.

---

[6] Shannon's Title VII claim cannot be stated against any individual defendant because there is no personal liability under that law. *Kahler v. Leggitt*, 2019 WL 3928622, at *4 (D. Colo. Aug. 20, 2019) (citing, *inter alia*, *Haynes v. Williams*, 88 F.3d 898, 899–901 (10th Cir. 1996)).

[7] Shannon's reference to Section 1983 cannot state any claim against any defendant because she does not allege any underlying constitutional violation. *E.g.*, *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979) ("§ 1983 by itself does not protect anyone against anything."); *cf. Hess v. Tulsa Cty. Sheriff*, 2008 WL 4682202, at *4 (N.D. Okla. Oct. 22, 2008) (dismissing Section 1983 claim for failure to plead constitutional deprivation).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *E.g.*, *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004). The court construes the evidence in the light most favorable to the non-movant; however, "to avoid summary judgment, a non-movant must provide significantly probative evidence that would support a verdict in [his or her] favor." *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d 1267, 1268–69 (10th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the nonmoving party. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ARGUMENT

### I.      The Board, Valentine, and Siegfried are Entitled to Summary Judgment.

As argued in Defendants' pending Motion to Dismiss, the Board is not a proper defendant, separate from the District. *Cf. K.D. v. Harrison Sch. Dist.* 2, 2018 WL 4467300, at *6 (D. Colo. Sept. 18, 2018). In Colorado, a school district is the entity subject to suit and encompasses its governing board. COLO. CONST. art. IX, § 15; § 22-32-101 (declaring each school district is body corporate and in its name may "sue and be sued").

In addition, there is no evidence that Valentine retaliated against, wrongfully terminated, defamed, or subjected Shannon to tortious interference and a tangible employment act. Valentine did not make the decision to nonrenew Shannon; that was "based on board action and principal recommendation." Ex. G, Tr. Valentine Depo., 13:9–11; *see also id.* at 14:15–25. Nor did he make any statements about Shannon; he did not respond to or participate in the APS reference call, *id.* at 22:5–11, or any other outside

employment inquiries about her, *id.* at 26:24–25, 27:7–8. Shannon argues Valentine should have proactively advised Thompson "to recuse herself from responding to any employment verification request unless she was considered a reference." ECF #36, p. 5, However, there is no such duty under the law, particularly given that Colorado law expressly authorizes truthful responses to school employment inquiries. § 22-32-109.7(2)(b), C.R.S. Valentine simply cannot be found liable based on his uninvolvement in the reference call and nonrenewal decision. *See MDM Grp. Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007) (stating that for tortious interference, "there must be a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party"); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) ("Personal participation is an essential allegation in a § 1983 claim.") (quoting *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir. 1976)); *McIntyre v. Jones*, 194 P.3d 519, 523–24 (Colo. App. 2008) (reciting elements of defamation); *Holmes v. Young*, 885 P.2d 305, 308 (Colo. App. 1994) (stating liability for aiding or abetting tortious act requires that "defendant is generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" and "knowingly and substantially assists the principal violation").

There similarly is no basis for liability against Siegfried. Contrary to Shannon's conclusory and unsupported allegations about Siegfried's duties when he was Superintendent, his only role in her nonrenewal was as the formal and legal administrative conduit of Thompson's recommendation to the Board, per § 22-63-203(4)(a), C.R.S. Ex. H, Siegfried Decl., ¶¶ 3–4. Every time he made nonrenewal recommendations, Siegfried did so in full reliance on his subordinates. *Id.* He had no personal or first-hand knowledge of the facts or circumstances of either Shannon's employment with the District or her contract nonrenewal. *Id.* at 5. Likewise, Siegfried had no personal involvement in the District's contracting with PEG for Beyond Diversity Trainings, which fell within the duties of subordinate staff. *Id.* at ¶ 6. The

District has contracted with PEG for at least 19 years, Ex. C, Giles Depo., 31:10–22, and the relationship predated Siegfried's service as superintendent, Ex. H, Siegfried Decl., ¶ 1. *Cf. Atwell v. Gabow*, 2008 WL 906105, at *9 (D. Colo. March 31, 2008) (holding hospital CEO was not individually liable under § 1981 because she had acted in her official capacity to develop and implement policies).

## II. Shannon's Discrimination and Retaliation Claims Fail.

A plaintiff may prove violation of Title VII or 42 U.S.C. § 1981—the standards are the same—either by direct evidence of discrimination, or by adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Crowe v. ADT Sec. Services, Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011); *see also Johnson v. Weld Cty.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010) (reasoning CADA claims are subject to same standard as Title VII). Shannon has no direct evidence of discrimination or retaliation, so the *McDonnell-Douglas* framework applies. Shannon must establish a prima facie case, and only if she can, the burden of production shifts to the District to establish a legitimate, non-discriminatory reason for the challenged adverse employment acts. *E.g.*, *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122–23 (10th Cir. 2007). The burden then shifts back to Shannon to show the District's reasons are pretextual. *E.g.*, *Johnson*, 594 F.3d at 1210–11.

### A. Shannon cannot prove a prima facie case of racial discrimination or a racially hostile work environment.

To establish a prima facie case of racial discrimination, Shannon must show she was: "(1) a member of a protected class; (2) qualified and satisfactorily performing her job; and (3) terminated under circumstances giving rise to an inference of discrimination." *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). In addition, "§ 1981 requires a showing of racial animus." *O'Neal v. Ferguson Constr.*, 237 F.3d 1248, 1258 (10th Cir. 2001) (citing *Patrick v. Miller*, 953 F.2d 1240, 1250 (10th Cir. 1992)). An employee's subjective belief is insufficient to demonstrate discrimination. *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1408 (10th Cir. 1997).

To establish a prima facie case of a hostile work environment based on race, Shannon must establish: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; and (4) due to the harassment's pervasiveness and/or severity, a term, condition, or privilege of her employment was altered and created an abusive working environment. *See Howard v. Okla. Dept. of Corr.*, 247 F.Supp.3d 1210, 1224–25 (10th Cir. 2017). A pervasively hostile work environment is not established "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). "Instead, there must be a steady barrage of opprobrious racial comments." *Id.* "[I]t is not enough that a particular plaintiff deems the work environment hostile; it must also be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015).

As argued in the pending Motion to Dismiss, Shannon has not pled sufficient facts to give rise to an inference of discrimination. Discovery has only weakened her case, and she continues to rely entirely on her own subjective perceptions. Shannon has no evidence that she was treated less favorably than her similarly-situated non-Black colleagues. Shannon asserts that "a White teacher was hired . . . by Thompson with probationary status," that a White teacher from another school was reinstated to his position after the District investigated allegations of racist conduct, and that white teachers "felt empowered to report to administration what [she] was doing in [her] classroom." ECF #36, pp. 11, 17. These examples do not establish disparate treatment, let alone a hostile work environment.

First, Shannon was also hired by Thompson with probationary status pursuant to § 22-63-203(2)(a), C.R.S., and in any event, Shannon did not have nonprobationary status from another Colorado school district to transfer. Ex. A, Thompson Decl., ¶ 5. As a matter of law, Shannon had to be hired on probationary status. § 22-63-203.5, C.R.S.; *see also Marzec v. Fremont Cty. Sch. Dist. No. 2*, 349 P.2d

699, 701 (Colo. 1960) (holding school district could not shorten statutory probationary period), *recognized as superseded by statute on other grounds in Johnson v. Sch. Dist. No. 1 in Cty. of Denver*, 413 P.3d 711, 713–14 (Colo. 2018). Second, Shannon does not even identify the teacher who was allegedly reinstated. The decision could be explained by nonprobationary status, and since he was at a different school, Thompson could not have been the decisionmaker. Individuals are only considered "similarly situated" when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of comparable seriousness. *E.g., E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007). Third, Shannon's concern about White teachers reporting her says nothing about disparate treatment. Shannon has no evidence that Thompson favored any such teachers with preferential treatment.

Thompson has recommended other teachers for nonrenewal, and nothing about those decisions remotely suggests disparate treatment or racial animus. Thompson served as principal at Highline for five years, Ex. A, Thompson Decl., ¶ 2, and before that, she was the principal at Rolling Hills Elementary, Ex. F, Thompson Depo., 72:4–6. During that time, Thompson recommended 12 teachers for nonrenewal; eight are White, two are Hispanic, and two are Black. Ex. B, Smith Decl., ¶ 14 & Attach. B-6. When Thompson recommended Shannon for nonrenewal in 2019, she recommended another teacher too, and that teacher is White. *Id.*; Ex. A, Thompson Decl., ¶ 19.

There also is no evidence that Thompson (or anyone else at Highline) made any racial slurs or otherwise evidenced an animus towards Blacks. At most, Shannon alleges she felt the equity meetings "victimized" and stereotyped her as an "angry Black woman," which she feels Thompson reinforced on one occasion when asking why Shannon was loud, argumentative, and angry as they discussed a balloon launch practice conflict with the regularly scheduled PLC meeting. ECF. #36, p. 21. Shannon, however, admits Thompson previously "overheard [her] being loud with the students," Ex. E, Shannon Depo.,

92:10–11, and others have complained about being loud and argumentative, *id.* at 135:2–6, 160:6–21. Shannon even admits, "that's just how [she] speak[s]." *Id.* at 161:1–4. "[I]solated incidents . . . are sufficient to support a hostile work environment claim only when they are 'threatening and severe' or 'especially egregious or extreme.'" *Brown v. Laferry's LP Gas Co., Inc.*, 708 F. App'x 518, 522 (10th Cir. 2017). No reasonable juror could find racial animus or a hostile work environment from Thompson and Shannon's interaction. *Cf. Salemi v. Colo. Pub. Emps. Ret. Assoc.*, 176 F. Supp. 3d 1132, 1147–48 (10th Cir. 2016) (holding employer's assertions that plaintiff was "quiet" and had closed body posture during meetings did not sustain inference of national origin discrimination); *Martinez v. Startek USA, Inc.*, 2020 WL 4448717, at *4 (D. Colo. 2020) (holding supervisor calling Hispanic customers untrustworthy did not establish discriminatory animus); *Humphries v. City Univ. of N.Y.*, 2013 WL 6196561, at *9 (S.D.N.Y. 2013) (finding colleagues calling plaintiff "angry" did not establish discriminatory animus despite plaintiff's belief that she was perceived as stereotypical angry Black woman). Further belying any notion of racial animus or intolerable hostility, Thompson concluded the conversation by granting Shannon's request to be excused from the PLC meeting. Ex. A, Thompson Decl., ¶ 13.

With respect to Shannon's disagreements with the equity-focused PLC meetings, the facts show that Shannon was not treated differently or subjected to a racially hostile environment. All Highline teachers were required to attend, and while Thompson expected staff to engage in the equity work, no one was required to actively participate in the meetings. *Id.* at ¶ 7. Shannon insinuates it was demeaning for her to discuss White Privilege. Although that may be true from Shannon's perspective, the purpose of discussing the topic is to "understand how whiteness or white privilege plays in [the District]," "create greater consciousness," and build "knowledge and capacity around racism." Ex. C, Giles Depo., 34:19–35:3. Unsurprisingly, the topic can be difficult for some individuals, including Whites, and no other African American employees—District-wide—have complained about the Beyond Diversity trainings or

having courageous conversations about race. *Id.* at 18:21–21:25, 23:7–10. According to the District's Assistant Superintendent for Equity, Culture, and Community Engagement Michael Giles, Black employees have given positive feedback. *Id.* at 22:23–23:6. Giles, who is Black, felt the training created "a safe space . . . to be able to share some experience that otherwise may not have been created." *Id.* at 8:21–25. From his Asian lens, Watanabe thought Beyond Diversity was "a powerful training where the facilitators brought educators forward to see the systemic nature in which race plays into education and learning in the world in general." Ex. D, Watanabe Decl., ¶ 8.[8]

### B.   Shannon cannot prove a prima facie case of retaliation.

To establish a prima facie case of retaliation under Title VII and Section 1981, Shannon must establish: (1) she engaged in protected opposition to discrimination; (2) the District took adverse action against her after or contemporaneous with the protected opposition; and (3) there is a causal connection between the protected opposition and the adverse action. *See, e.g., Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir. 1996). "Although no magic words are required . . . , the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII/Section 1981]." *Hinds v. Sprint/United Mgmt.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "General complaints about company management . . . will not suffice." *Id.*

Shannon alleges she confided in Watanabe on two occasions—first about the balloon launch interaction with Thompson, and second about the Black History musical. ECF #36, pp. 21–22. According to Shannon, those were the only times she spoke out. Ex. E, Shannon Depo., 87:13–88:10. Although Shannon labels them "courageous conversations," and even accepting her account of what was shared,

---

[8] To the extent it relies on Title VII, Shannon's hostile work environment claim fails at the outset for lack of exhaustion because it was not included in her EEOC charge. Ex. K, L. Shannon EEOC Chrg. "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007); *cf. Wolfe v. US Bank Nat. Ass'n*, 2012 WL 1604659, at *2 (D. Colo. May 8, 2012) (holding plaintiff must check "other" box or describe hostile work environment in body of charge to exhaust claim).

neither can be reasonably construed as protected activity, directed at racial discrimination.

As already discussed, Thompson's alleged remark about Shannon being loud, argumentative, and angry had no racial overtone. *See, e.g., Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) ("[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race . . . does not constitute protected activity and will not support a retaliation claim."). The fact that Shannon may have been personally offended by the musical also would not have conveyed to Watanabe that she believed Thompson (or anyone else) engaged in unlawful discrimination. *Cf. Parker v. Salazar*, 431 F. App'x 697, 698–99 (10th Cir. 2011) (holding complaint regarding coworkers' "morally offensive" conduct was not protected activity). While Shannon may have viewed Highline's equity meetings negatively, she does not allege she told Watanabe that she opposed them or that such opposition was based on her perception of racial discrimination. He heard Shannon say she did not like the large group format of the meetings. Ex. D, Watanabe Decl., ¶ 9.

Shannon also cannot establish a causal connection between her conversations with Watanabe and Thompson's decision to recommend her for nonrenewal. Shannon and Watanabe's mid-year evaluation meeting took place in December 2018, *Id.* at ¶ 9, and Shannon alleges they spoke about the musical in February 2019, Ex. E, Shannon Depo., 87:13–88:10. Thompson, however, did not notify her of the nonrenewal recommendation until April 2019. *Id.* at 161:14–23, 175:22–25. The Tenth Circuit has held that three- and four-month delays between a protected activity and an adverse employment action are too long to raise an inference of retaliation. *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997).

Moreover, while Watanabe was Shannon's evaluator in the 2018–19 school year, he was not involved in the nonrenewal decision. Ex. D, Watanabe Decl., ¶¶ 3, 12. For Shannon's comments to Watanabe to have had any possible impact on her nonrenewal, they would have had to have been

communicated to Thompson. *See Petersen v. Utah Dep't of Corr.,* 301 F.3d 1182, 1188–89 (10th Cir. 2002) (holding there was no retaliation where alleged retaliator did not know about protected activity). Shannon makes an "assumption" that Watanabe shared her concerns about Thompson, the equity work at Highline, and the Black History Month musical with Thompson. ECF #36, pp. 7, 22; Ex. E, Shannon Depo., pp. 88:25, 89:1–3. Yet, both Watanabe and Thompson unequivocally say that did not happen. Ex. D, Watanabe Decl., ¶¶ 9–10; Ex. M, Watanabe Depo. p. 46:2–4; Ex. A, Thompson Decl., ¶¶ 17–18; Ex. F, Thompson Depo., pp. 97:14–98:8. Shannon admittedly can muster no evidence otherwise. Ex. E, Shannon Depo., pp. 86:11–90:19.

Shannon seems to additionally allege that Thompson responded to the APS principal's reference request in retaliation for making an EEOC Charge or internal grievance. However, Thompson had already decided she would provide a reference before Shannon filed an EEOC charge or a grievance, and she told Shannon that when notifying her of the nonrenewal decision. Thompson was clear that she would not write a letter of recommendation but would provide a reference. Ex. E, Shannon Depo., 163:10–15; Ex. F, Thompson Depo., 58:2–10. By that time, Shannon knew Thompson had concerns about her performance. Ex. A, Thompson Decl., ¶¶ 8–11, 13. In response to feedback received verbally during her first year, Shannon asked Thompson if she should look for another job. *Id.* at 111:23–24. Concerns are also documented in Shannon's annual written evaluations. Ex. E, Shannon Depo., 112:8–24. While Shannon may dispute some of Thompson's concerns, she admits the information Thompson provided in the reference call was truthful. *Id.* at 139:3–141:9, 209:12–25. No causal connection can be inferred from these undisputed facts. *Cf. Fields v. Phillips Sch. of Bus. & Tech.*, 870 F. Supp. 149, 153 (W.D. Tex. 1994) (granting summary judgment where employer's unrebutted evidence established negative reference "was based upon [supervisor's] personal observations . . . , as well as [employer's] business records."), *aff'd* 59 F.3d 1242 (5th Cir. 1995).

**C.      There were legitimate, nondiscriminatory reasons for Shannon's nonrenewal and reference.**

Even if Shannon could establish a prima facie case of discrimination or retaliation, the District can meet its burden under *McDonnell Douglas*. Thompson recommended Shannon for nonrenewal because she believed that Highline's students would benefit from more effective STEM instruction than Shannon was able to provide. Ex. A, Thompson Decl., ¶ 15. While there were numerous concerns, Shannon ultimately had not shown as much growth as Thompson expected from a veteran teacher over three years. *Id.* Thompson felt Shannon was unlikely to improve, and she was confident that she could recruit a better teacher from the applicant pool. *Id.* at ¶ 16. These certainly are legitimate, non-discriminatory grounds to end employment. *E.g.*, *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009); *accord Burns v. Snow*, 130 F. App'x 973, 984 (10th Cir. 2005) (recognizing "attendance deficiencies" as well); *see also Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (explaining burden of establishing non-discriminatory reason for alleged actions is "exceedingly light").

As for the reference, Thompson received a call from an APS school leader seeking information about Shannon. Ex. A, Thompson Decl., ¶ 21. Consistent with her regular practice and the advance notice she gave to Shannon, Thompson responded, and she provided accurate information about Shannon's 26 absences in the 2018–19 school year, as well her failure to provide final student learning objectives. *Id.*; Ex. E, Shannon Depo., 163:10–15; Ex. F, Thompson Depo., 58:2–10. Accordingly, there were legitimate, non-discriminatory grounds for Thompson's reference. *See Fields*, 870 F. Supp. at 153.

**D.      Shannon cannot prove pretext.**

Generally, a plaintiff demonstrates pretext by producing evidence such as weaknesses, implausibilities, inconsistencies, or contradiction in the employer's proffered legitimate reasons that a reasonable fact finder could rationally find them unworthy of credence. *E.g., Sanders v. Sw. Bell Tel.*, 544 F.3d 1101, 1106 (10th Cir. 2008). An employer's legitimate non-discriminatory reason is not "'pretext for

discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (internal citations omitted). "[A] challenge of pretext . . . requires a court to look at the facts as they appear to the person making the [employment] decision to terminate, not the aggrieved employee." *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007). Further, "[t]he relevant inquiry is not whether [the] proffered reasons were wise, fair or correct, but . . . whether [the employer] believed those reasons to be true and 'acted in good faith upon those beliefs.'" *Id.* (citations omitted). Relevant to the issue of pretext is an employer's "good faith perception" of the reason for the adverse employment action—not a plaintiff's subjective belief. *Id.* at 1201; *see also Furr v. Seagate Tech. Inc.,* 82 F. 3d 980, 988 (10th Cir. 1996) ("[I]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.").

Shannon may try to argue pretext, but she cannot succeed. Three different evaluators documented performance and conduct concerns during each of Shannon's three years at Highline. Ex. A, Thompson Decl., ¶¶ 8–9; Ex. D, Watanabe Decl., ¶¶ 4–5, 9. Shannon learned of those concerns through both meetings with her evaluators and in her written evaluations. Ex. A, Thompson Decl., ¶¶ 8–11; Ex. D, Watanabe Decl., ¶¶ 4–5, 9, 11; Ex. E, Shannon Depo., 93:2–10, 111:14–113:14. Her overall performance rating hovered at the threshold for effectiveness her first two years and was aided by the positive impact of Highline and the District's overall state performance framework ratings. Ex. A, Thompson Decl., ¶¶ 10–11 & Attachs. A-1, A-2; *see also* Ex. B, Smith Decl., ¶ 10. In the third year, Shannon's rating slipped to partially effective, which did not meet expectations and was unsatisfactory. Ex. D, Watanabe Decl., ¶ 11 & Attach. D-1. Consistent throughout the evaluations are documented concerns around differentiation and scaffolding for students, as well as rigor. Ex. A, Thompson Decl., ¶¶ 9, 11, 14. As Watanabe summarizes, Shannon "seemed to be doing the very bare minimum amount of work to be a classroom teacher." Ex. D,

Watanabe Decl., ¶ 5.

Shannon admits she was absent from her classroom for 54 days over three years, with nearly half—26 absences—in her third year alone. Ex. E, Shannon Depo., 209:12–25, 221:18–21. She acknowledges those absences burdened her colleagues disproportionately—that is, they had to cover for her more than she had to cover for them. *Id.* at 223:18–22, 224:23–225:7. She further admits not submitting her final SLOs, despite Watanabe's repeated requests. *Id.* at 139:3–141:9. And she admits never providing lesson plans to Watanabe, which he requested based on her frequent screening of videos in class that did not seem to have any connection to STEM, including the Disney movies *Moana* and *Frozen*, as well as the animated television series, *The Magic School Bus*. Ex. D, Watanabe Decl., ¶ 5; Ex. E, Shannon Depo., 137:24–138:20, 150:17–151:6. Furthermore, Thompson observed Shannon using a harsh, disrespectful tone with students, which Shannon admits, and Thompson felt Shannon raised her voice and became very argumentative about needing to miss a regularly scheduled PLC meeting. Ex. A, Thompson Decl., ¶¶ 9, 13; Ex. E, Shannon Depo., 92:10–11. Shannon even admits she normally speaks loudly, which may have prompted a parent's complaint that she was argumentative. *Id.* at 160:1–161:4.

The fact that Thompson twice renewed Shannon after her first two years further eliminates any reasonable finding of pretext. Thompson hired Shannon, aware that she is Black. Ex. A, Thompson Decl., ¶ 4. . It "makes little sense to deduce" that Thomson later recommended Shannon for nonrenewal because of her race. *Antonio v. Sygma Network*, 458 F. 3d 1177, 1183 (10th Cir. 2006). Indeed, a minority herself, Thompson felt very strongly about equity and inclusion at Highline, devoting one PLC meeting every month to those topics. *Id.* at ¶¶ 2, 6. Thompson retained Shannon because she valued her diversity for the school's diverse student population. *Id.* at ¶ 11. She also wanted to give Shannon the benefit of the doubt and multiple opportunities to grow as a teacher. *Id.* at ¶¶ 10–11. After three years, however, Thompson was faced with the practical reality of state teacher employment law. As the District's Chief Human

Resources Officer explains, Colorado's extensive due process and for cause dismissal protections for nonprobationary teachers means that a third-year probationary teacher should be nonrenewed if there are any performance concerns. Ex. B, Smith Decl., ¶ 10.

Thompson expected more from a veteran teacher over three school years. Ex. A, Thompson Decl., ¶ 15. She believed Highline's students would benefit from more effective STEM instruction than Shannon could provide and determined Shannon was unlikely to improve as a teacher. *Id.* at ¶¶ 15–16. Ultimately, Thompson was confident she could recruit a better teacher from the applicant pool. *Id.* at ¶ 16. And that is what Thompson communicated to Shannon when they met to discuss the nonrenewal. Thompson expressly referenced Policy 4173 and gave Shannon a printed copy, which plainly states the District's "obligation is to secure the best teachers possible." Ex. E, Shannon Depo., 161:17–23; Ex. F, Thompson Depo., 55:11–13; Ex. L, 2018-2019 Teachers Negotiated Agreement, p. 35. Thompson accurately told Shannon the nonrenewal was not due to performance because the reason code was "other" under Policy 4173—not the separate reason code for ineffective performance. Ex. A, Thompson Decl., ¶ 16. The undisputed evidence establishes that Thompson acted in good faith, and Shannon can muster no weaknesses, implausibilities, inconsistencies, or contradiction that a reasonable fact finder could rationally accept.

### III.    The District is Not Liable under Section 1981.

"A municipality cannot be held liable on a *respondeat superior* theory." *Brazzle v. Wash. City*, 977 F. Supp. 2d 1065, 1084 (D. Utah 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,  691 (1978)). "[F]or municipal liability to arise under section 1981, [Shannon]  must demonstrate that the [District]'s officials acted pursuant to a custom or policy of discriminatory employment practices." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (internal quotation omitted). Shannon's allegations do not meet this burden, and her discrimination and retaliation claims against the District based

on § 1981 are subject to dismissal and summary judgment.

> **A.**   **Shannon has not alleged an official policy or an actual custom of discriminatory practices.**

Shannon alleges the District's nonrenewal policy is "unfair" and "bias[ed]" because it allowed her to be nonrenewed for unspecified reasons "not based on [her] work performance." ECF. #36, pp. 32–33. As an initial matter, the policy Shannon references was approved in 1994 and is part of the negotiated agreement between the District and the Cherry Creek Education Association. Ex. L, 2018-2019 Teachers Negotiated Agreement. The policy also follows Colorado law, which allows a probationary teacher's contract to be nonrenewed for any reason deemed sufficient. § 22-63-203(4)(a). That an employee might possibly recommend nonrenewal for a discriminatory reason does not make Policy 4173 an official policy or actual custom of discriminatory practices. The moving force in that instance would be the employee—not the policy. *Cf. Pyne v. D.C.*, 298 F. Supp. 2d 7, 10 (D. D.C. 2002) (dismissing § 1983 claim because policy that employees terminated through reduction in force could not be rehired did not support municipal liability). Indeed, other District policies expressly prohibit discrimination because of race or color. Ex. B, Smith Decl., ¶ 13 & Attach. B-4.

As for a "custom" of discriminatory employment practices, this "has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988) (explaining custom requires that illegal practice be "widespread"—i.e., involving "series of decisions"). Shannon neither alleges nor can prove any widespread practice of racial discrimination whatsoever, let alone one "that . . . is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010); *see also Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (emphasizing plaintiff's "failure to allege the existence of similar discrimination as to

others seriously undermines her claim that the City maintained a custom of discriminatory practices"). She is offended by the Beyond Diversity training and equity work at Highline, but Shannon cannot dispute that her subjective view has not been validated by other employee complaints, the purpose of the training and equity work is to counter racism, and many employees of a minority race feel it is valuable and effective. Ex. C, Giles Depo., 6:23–7:1, 8:21–8:25, 18:21–21:25, 22:23–23:10, 34:19–35:3; Ex. D, Watanabe Decl., ¶ 8.

### B.     No discriminatory act was committed by a final policymaker.

Where, as here, "a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009). Thompson made the nonrenewal decision, Ex. A, Thompson Decl., ¶ 15, but she is not a final policymaker. Under Colorado law, the District's Board is the final policy making authority regarding teacher employment. §§ 22-32-109(1)(f)(I), -110(h), C.R.S.; *Singer v. Denver Sch. Dist. No. 1*, 959 F. Supp. 1325, 1330 (D. Colo. 1997). To hold the District liable, Shannon must establish that the Board terminated her with a discriminatory or retaliatory motive. *See Wulf v. City of Wichita*, 883 F.2d 842, 868–69 (10th Cir. 1989) (explaining "it is inconceivable" that final policymaker would be liable if it believed, for example, that good grounds existed for approving termination). The undisputed evidence forecloses any such finding. The Board did not know Shannon's race, and it did not know she had filed grievances. Ex. B, Smith Decl., ¶¶ 8, 12; Ex. I, Bates Decl., ¶ 4; Ex. J, Bates Depo., 9:1–4. Shannon was recommended for nonrenewal with more than 60 other teachers, and all were approved in a single vote. Ex. B, Smith Decl., ¶¶ 8–9, 12 & Attach. B-3. *Cf. Brooks v. Denver Pub. Schs.*, 2017 WL 5495793, at *6 (D. Colo. Nov. 16, 2017) ("Mr. Brooks does not allege the superintendent had knowledge of Mr. Brooks' discriminatory complaints.").

**IV.     Shannon's State Law Tort Claims Must be Dismissed for Lack of Jurisdiction.**

As argued in the pending Motion to Dismiss, Shannon's defamation and tortious interference claims against the District are barred by the Colorado Governmental Immunity Act. §§ 24-10-106, -108, C.R.S.; *Moaz v. City & Cty. of Denver*, 2017 WL 6381688, at *2 (D. Colo. Dec. 14, 2017) (holding tortious interference claims are subject to dismissal under CGIA); *Gallagher v. Bd. of Trs. for Univ. of N. Colo.*, 54 P.3d 386, 395 (Colo. 2002) (holding defamation is tort), *rev'd on other grounds by Martinez v. Estate of Bleck*, 379 P.3d 315, 322 (Colo. 2016). Shannon does not plead and cannot present any facts suggesting the District's immunity has been waived.

The CGIA also bars tort claims against public employees for acts they made during the performance of their duties and in the scope of their employment, absent the employees' willful and wanton conduct. § 24-10-118, C.R.S. The central inquiry regarding whether employees acted within the scope of their employment is whether the employees were engaged in an activity that bears some relationship to their employer's business. *Pham v. OSP Consultants, Inc.*, 992 P.2d 657, 659 (Colo. App. 1999). Here, Shannon alleges that Thompson's communication to a prospective employer of the amount of days Shannon was absent and "one missing document" constituted defamation. ECF. #36, p. 26. Her tortious interference claim appears to be based on that same communication and her nonrenewal. *Id.* at 25–29. Both acts relate to the District's operation as a public school district, so the CGIA must apply.

To bring a tort claim against District employees performing their duties in the scope of their employment, the CGIA requires plaintiffs to first provide notice to either the Board or the District's counsel within 182 days after they discover the injuries. § 24-10-109(1), (3)(a), C.R.S. Shannon has not alleged or established that she provided such notice to the proper party. As a result, her tort claims against all the individual defendants are barred by the CGIA.

Moreover, to overcome the jurisdictional bar to tort actions against public employees, the CGIA

requires plaintiffs to plead a specific factual basis. § 24-10-110(5)(a), C.R.S. Willful and wanton conduct is "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." § 13–21–102(1)(b), C.R.S. Under the CGIA, a plaintiff claiming defamation must show not only wanton indifference to the falsity of a statement, but also intent or reckless disregard of the injury that the statement causes. *Zerr v. Johnson*, 894 F. Supp. 372, 376 (D. Colo. 1995). As also argued in the Motion to Dismiss, Defendants, including Thompson, are otherwise immune from Shannon's defamation and tortious interference claims as a matter of law under § 22-32-109.7(2)(b), which grants former employers immunity from civil liability for sharing truthful information regarding job candidates with school districts.

### V.    Shannon Cannot Prove Thompson Defamed Her or Committed Tortious Interference.

"Truth is a complete defense to defamation." *Gordon v. Boyles*, 99 P.3d 75, 81 (Colo. App. 2004). To succeed, "absolute truth is not required; instead, a defendant need only show substantial truth, that is, 'the substance, the gist, the sting of the matter is true.'" *Id.* (quoting *Gomba v. McLaughlin*, 504 P.2d 337, 339 (Colo. 1972)). It is now undisputed that Thompson's statements to the APS school leader were truthful. Ex. Am Thompson Decl., ¶ 21; Ex. E, Shannon Depo., 139:3–141:9, 209:12–25. Even if the claim survives Defendants' assertion of the CGIA, summary judgment must enter. The same defense defeats Shannon's claim of tortious interference. Thompson did nothing "improper" when she gave accurate information to a school leader from another district who called her for a reference about Shannon. *See MDM Grp. Assocs.*, 165 P.3d at 886. Additionally, Shannon can offer no evidence that Thompson intentionally tried to prevent her from getting a job in APS. *See id.* The same evidence refuting any inference of discrimination or retaliation establishes Thompson had no intent to ruin Shannon's chance at the job. It was her regular practice to respond to reference requests, and she told Shannon she would. Ex.

A, Thompson Decl., ¶ 21; Ex. E, Shannon Depo., 163:10–15; Ex. F, Thompson Depo., 58:2–10. Thompson even spoke favorably about Shannon to the APS school leader. Ex. A, Thompson Decl., ¶ 21.

## CONCLUSION

Based upon the foregoing, Defendants requests that the Court issue an order granting them summary judgment on all of Shannon's claims.

RESPECTFULLY SUBMITTED this 18th day of February 2022.

SEMPLE, FARRINGTON, EVERALL & CASE, P.C.

By: *s/ Jonathan P. Fero*
Jonathan P. Fero
Mary B. Gray
1120 Lincoln Street, Suite 1308
Denver, CO  80203
Telephone: (303) 595-0941
FAX: (303) 861-9608
jfero@semplelaw.com
mgray@semplelaw.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of February 2022, a correct copy of the foregoing **MOTION FOR SUMMARY JUDGMENT** and exhibits was filed via CM/ECF and served via email to the following:

Leslie Shannon
7927 S. Kittredge St.
Englewood, CO 80112
leslieshannon@hotmail.com

*Pro se Plaintiff*

By: *s/Kathleen Schmidt*